UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

MARIE SALTS                                                          PETITIONER

V.                                          CIVIL ACTION NO.1:08CV182-GHD-JAD

CHRISTOPHER EPPS AND JIM HOOD                                       RESPONDENTS

CONSOLIDATED WITH

MICHAEL SALTS                                                       PETITIONER

V.                                          CIVIL ACTION NO.1:08CV183-GHD-JAD

CHRISTOPHER EPPS AND JIM HOOD                                       RESPONDENTS

<u>REPORT AND RECOMMENDATION</u>

The petitioners Marie and Michael Salts, a married couple, ran a funeral home in Booneville,

Mississippi. As a part of their business they collected premiums from customers for burial policies.

At different times they did business with two different burial insurance companies and also sold their

own small Class A policies. Michael was the individual who handled most of the day to day contact

with people coming into the funeral home. He frequently received burial insurance premiums from

their customers. Marie handled the bookkeeping for the business including being responsible for

submitting paid burial policy premiums received from customers to the insurance companies. When

monies their customers expected to be paid were not and policies were canceled, the Saltses were

prosecuted for embezzlement.

The Saltses were jointly indicted in May 2003 in Prentiss County, Mississippi on six counts

of embezzlement. The indictments alleged that over a period of seventeen years the Saltses had

embezzled thousands of dollars from six named individuals. At trial the time period of the alleged

embezzlements was limited by the prosecution from December, 1994, until the first half of March, 2002.[1]

In December 1994, the first of the insurance companies, Gulf National, had terminated their agency relationship with the Saltses. Thereafter, the Saltses shifted some of their business to the other insurance company, Magnolia Guaranty. Some of the Saltses customers listed in the indictments had their insurance changed from Gulf Guaranty to Magnolia and some did not. One count of the indictment was dismissed at trial because of the declining health of a complaining witness. The five remaining named individuals each testified that monies they paid to the Salts Funeral home during this time period were intended as premiums on Gulf Guaranty policies. None claimed to have agreed to move their policies to Magnolia. Marie testified and claimed that neither she nor Michael had embezzled any monies. She blamed some of the funeral home's former employees for any embezzlement and/or for the failure to forward monies. Michael did not testify at trial.

Marie and Michael were each convicted in October 2005 on three counts of felony embezzlement and one count of misdemeanor embezzlement. They were each acquitted by the jury on one count. Marie was sentenced to two consecutive five year sentences, fined $ 11,000.00 and ordered to pay restitution in the amount of $692.00. Michael was convicted on the same counts and received the same sentence except his sentence was imposed without the possibility of parole because of his habitual offender status.

Marie and Michael initially retained Steve Farese to represent them. Farese was allowed to withdraw from representation in September 2003 because of a conflict of interest. The Saltses then

---

[1] This refers only to the four counts on which the Saltses were ultimately convicted.

retained Michael Thorne to represent them. Thorne filed for and was granted a series of continuances between the spring of 2004 and August, 2005. The continuances were requested both on the basis of needing time to prepare for trial and because of serious health problems suffered by Thorne's wife and father. There were also delays in the case caused by ongoing renovations at the Prentiss County courthouse. Two times the case would have been continued anyway because two separate circuit judges found it necessary to recuse themselves shortly before scheduled trials.

On Thursday, September 29, 2005, four days before the scheduled trial date, the Saltses delivered a letter to the trial judge advising that they were terminating Thorne. The following day they and Thorne appeared before the judge for the last hearing on pre-trial motions. They advised the trial court that they did not see eye-to-eye on the handling of the defense and that Thorne was discharged because he was not prepared for trial. They advised the court that they had retained Jim Waide as their counsel. The trial court was adamant that the case would not be continued. A motion on the day of trial sought either a dismissal or a continuance on the ground that a conflict of interest existed between Michael and Marie such that counsel should not be required to represent both of them at trial. The motion was rejected after brief argument and without a hearing or the opportunity to present proof.

The convictions and sentences[2] were affirmed by the Mississippi Court of Appeals and the Mississippi Supreme Court denied the petition for a writ of certiorari. The Saltses have filed petitions for writ of habeas corpus in this court asserting two grounds for relief.[3]

---

[2]The Mississippi Court of Appeals remanded the case only as to the order for restitution to the named individuals. The court found that since each policy had been reinstated by the insurance company there was no basis for ordering restitution to the individuals.

[3] A third ground for relief has been abandoned since the filing of the petition.

## LIMITATIONS ON REVIEW

Because there is no question that the Saltses have fully complied with all procedural requirements of Mississippi and federal habeas law, this court must consider each of their claims on the merits. This court's power to upset the judgments of the state courts in a criminal matter is appropriately very limited. The federal courts address only issues affecting substantial federal constitutional rights. The federal courts do not function as super-appellate courts over the states and hold no supervisory authority over those courts. The federal courts may not correct errors of state law unless they also violate the constitutional rights of an accused. [4]

Even in matters affecting fundamental constitutional rights the federal courts have a very limited scope of review. Title 28 U.S.C. § 2254(d) of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) provides:

> (D) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The federal courts may not disturb the legal holdings of the state courts even if convinced they are erroneous. The federal courts may intervene only if it the application of federal law is also contrary to clearly established federal law or objectively unreasonable. *Williams v. Taylor*, 529 U.S.

---

[4] *Smith v. Phillips*, 455 U.S. 209 (1981); *Engle v. Isaac,* 456 U.S. 107, 121, n. 21 (1982); *Gilmore v. Taylor*, 508 U.S. 333 (1993) (O'Connor, J. concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). *Id* at 348-9.

4

362 (2000). The AEDPA presumes each factual finding by the state court is correct. The petitioners' claims have been reviewed in light of the AEDPA's limitations.

SUMMARY OF THE RECORD

On May 12, 2003, the Saltses were indicted and arraigned on July 3, 2003. They were initially represented by Steve Farese. On September 2, 2003, Farese filed a motion to withdraw based upon a conflict of interest.[5] The motion stated, "Steven E. Farese, Sr. would submit that upon discussion of this matter with one of the Defendants that two separate irreconcilable conflicts arose. Based upon these conflicts, Defense Counsel is ethically and legally unable to defend either of these defendants." (R: 1:60). The state's response to the motion did not dispute the existence of a conflict of interest (R.1:64), and on September 18, 2003, an order was entered by the trial court judge allowing Farese to withdraw. The case was continued until February, 2004. (R.1:66).

It is unclear when Thorne was retained, but on February 23, 2004, (R1:67-68) Thorne filed a motion for a continuance, citing the failure of Farese to turn over discovery, the general complexity of the case and a possible need for the assistance of an accountant. As it turned out the case had to be continued in any event because a trial judge recused herself from the case. (R. 1:87).

Thorne filed another motion for continuance on June 20, 2004, claiming that an accountant was needed in order to prepare for the trial. (R. 1:70-71) The next day the trial judge signed an agreed order.

On September 24, 2004, Thorne again moved for a continuance of the case that was then scheduled for trial in early October 2004. Thorne claimed he was unprepared for trial due to the demands of other litigation involving these defendants. The order continuing the case until further

---

[5] While the case was before more than one of the trial judges during its time on the docket, the order was entered by the judge who later tried the case.

order of the court was signed the same day. On October 12, 2004, the state apparently unaware of the grant of the continuance, filed a response in opposition. The response noted that renovations were still ongoing at the Prentiss County courthouse and a courtroom was, therefore, unavailable for trial. The state suggested that a Prentiss county jury be allowed to try the case in a neighboring county, in lieu of furthering continuing the trial. The state voiced its concern that delay would prejudice the prosecution because most of the complaining witnesses were elderly. (R.1:80-81)

On February 28, 2004, Judge Paul Funderburk recused himself. (R 1:83) This recusal triggered a continuance of a February, 2005, trial date. (R. 1:87) On April 4, 2005, the judge who eventually tried the case reset the trial for June 27, 2005. This order specifically noted that the case would be continued if the courthouse renovations had not been completed.

Thorne filed another motion for continuance on June 24, 2005. Thorne was scheduled to leave before trial to take his wife to Florida for "medical treatment for an ongoing serious medical condition." This motion also notes that the courthouse was still not available due to ongoing renovations. (R 1:85-6) On June 27, 2005, the state filed its response in opposition. (R 1:87) The state again noted the possibility of prejudice to the state because of the age of its witnesses but also recognized the continuing unavailability of the Prentiss County Courthouse because of ongoing renovations. An order of continuance was entered on July 1, 2005, and the case reset for trial September 6, 2005. (R. 1:92-93)

On August 16, 2005, because his father was hospitalized Thorne asked for a continuance. (R. 2:238) The motion was granted and the case continued. The case was set for trial in Lee County on October 3, 2005, after the defendants' motion for a change of venue was granted. (R. 2:264).

On September 28, 2005, Thorne again filed a motion for continuance of the trial "due to illness in Defendant's counsel's immediate family. Additionally, counsel for the Defendants request additional time in which to prepare for the trial of this matter to properly defend this case." (R. 2:275). There was never a ruling on this motion. Thorne also filed a motion to sever and hold separate trials for each of the counts of the indictment. The next day on Thursday, September 29, 2005, a letter from Saltses to Thorne terminating him was delivered to the trial judge.

On the Friday before trial, the Saltses and Thorne both appeared at the time appointed for the last of the pretrial motions hearing. The following is the pertinent portion of the transcription of that hearing.

> THE COURT: This matter is before the Court this morning on several motions filed by the State and I think by the defendants. The first order of business I think is to take up a recent development.
>
> Yesterday sometime during the afternoon, I don't remember when, there was a letter delivered or a copy of a letter delivered to the court administrator's office, the clerk's ( R5:73) office and apparently Mr. Thorne, terminating his legal services. Now, a copy of this letter is in the file. *Insofar as it is effective in terminating the services of Mr. Thorne, I have no question, but insofar as it's gaining a continuance of this matter, I do have an opinion, and that is come Monday morning this case is going to trial.*
>
> *Now, by discharging your attorney, Mr. Salts and Mrs. Salts you have left yourself in a difficult position, but that's your decision, not mine.* I strongly suggest that you either agree to proceed with Mr. Thorne, work that out between the two of you, that's not within my purview, or in the alternative find an attorney who is willing to at least sit with you during the course of this to advise you about the legalities and the practice and procedure that is followed in the court. Otherwise, you're going to have a great difficulty representing yourself, I'm afraid.
>
> And now that we've got that out of the way, we'll move on to other business.
>
> MR. THORNE: Your honor, if I may for the record, there was an attorney that discussed possible representation or picking up the representation with me yesterday. He came by late in the evening around 5:00, 5:30 and picked up a substantial amount of file to review. In (R. 5:74) fact, the motions that were set for today, he now has those motions and the information and so forth that I had to go over that last night.
>
> THE COURT: Well that's interesting, but of no clock-stopping circumstances far as I'm concerned.

Now, I don't know what the problem is. And again, I don't care what the problem is. That's not my prerogative to look into the relationship between attorneys and their clients. *It has taken me something in the neighborhood of six to eight months to arrive at a trial setting for this, not entirely because of things the defendants did, but a portion of that had to do with the fact that the courthouse in Prentiss County was being remodeled or what ever, and we didn't have a courtroom to try this case, but finally it is set for trial. I have an venire panel coming in on Monday and, any thoughts about a continuance in this case, you can abandon that. Any attorney who comes in to it at this late date must assume that it is for trial, because I'm not going to continue it.* Any questions about that?

      MR. SALTS: We don't have time to obtain an attorney?

      THE COURT: Sir?

      MR. SALTS: We don't have time to obtain an attorney? (R. 5:75).

      THE COURT: *You're not going to get a continuance. You've got from now to Monday morning at 9:00. But I'm not going to continue this case. If that's what this is all about --*

      *MR SALTS: It wasn't about that, Your Honor. No, sir.* (R. 5:76).

Thereafter Thorne consulted once more with the Saltses and confirmed to the court that he was out of the case. The court then proceeded to take up motions though the Saltses were unrepresented. When they objected to being forced to defend the motions without counsel the prosecuting attorney suggested that this was just a delaying tactic. The court opted to proceed with the motions.

During the course of the hearing on the motions the Saltses went into further detail about their concerns and their reasons for discharging Thorne.

      MRS. SALTS: Can I go on the record and say something, Your Honor? And I'm not trying to be (R.5:79) hostile or anything disrespectful, but we are asking for an attorney because we don't know what these rules are. We asked Mr. Thornton yesterday--we dismissed him on the grounds because we don't see eye to eye on how we're being represented to the fullest on this. And I do believe and I feel like that I'm entitled to have an attorney to be able to address these criminal charges that I'm not guilty of to start with, and that's why I'm asking.

      THE COURT: You had one until yesterday afternoon when you fired him.

      MR. SALTS: We had a reason to fire him, Your Honor.

      MRS. SALTS: I talked to him -- we didn't see eye on the way this was being handled.

      THE COURT: I can't help that.

MRS. SALTS: Well, I just wanted to go on the record to make sure of it.

THE COURT: Very well. It's on there. (R. 5:80)

At another point in the hearings Marie again objected to being forced to proceed without

counsel. The court replied:

> THE COURT: *I think it might be well for us to have a clear understanding about where we are in this matter. Until yesterday, sometime late in the afternoon, you were represented by an attorney who was thoroughly competent.* Because of some disagreement with him you terminated his services and I assume have made arrangements for another attorney to undertake to represent you. It has been a long-standing practice and rule that an attorney accepting employment in the case in the posture this one finds itself takes it on with all the responsibilities that go along with it, including being at this hearing. (R5:85)(Emphasis added)

Still later there was additional discussion of about the reasons for Thorne's discharge.

> THE COURT: All right. Now, Mr. and Mrs. Salts, I do not know the status of preparation. I don't know if Mr. Thorne has subpoenaed witnesses or what. I don't know.
>
> MR. SALTS: He hasn't no, sir. No, sir.
>
> MRS. SALTS: *That was the purpose of the problem. There's nothing been done* and as he started in questioning me the other day on the stand.
>
> MR. SALTS: His wife's been sick.
>
> MRS. SALTS: His wife's been sick and his daddy's dying. He hasn't had the adequate time to prepare for this case.
>
> MR. SALTS: *Every time we would go up there, he would be gone.*
>
> MRS. SALTS: and, therefore, that's why we felt like we were not being --
>
> MR. SALTS: That's the truth. (R.5:87).
>
> MRS. SALTS: -- represented to the fullest that we should be. And that's why I went -- that's why we went to the court record as to now to say that I don't feel like that this case should be heard until our attorney has time to prepare for it --
>
> MR. SALTS: At least get some witnesses.
>
> MRS. SALTS: -- and be able to get this thing together. That's all I was asking for. And we're not trying to delay this case. We haven't tried to delay it from day one.
>
> THE COURT: Mrs. Salts, Mr. Salts, you have been present during each and every hearing that has transpired in this with the exception of a brief period yesterday when counsel for the State and your attorney and I had a discussion about continuance of the case. I think you heard every word that's been said.
>
> MR. SALTS: *We can't act for him, Your Honor. He didn't do this. That's all we can say.*
>
> THE COURT: And this matter has been set for trial for weeks at least. I don't remember when the order was entered setting it, some time.

MR. SALTS: *And every time we would go up there, Your Honor, he would be gone with his wife, and that's documented. That's the truth. She would sit there and the information that he gave you, she had to get up there and get it (R5:88) together and give him. That's just how it came down.* (R. 5:89).

The prosecution argued that the defendants were trying to delay the trial and manipulate the court's docket. The court again reiterated his determination not to continue the trial.

THE COURT: The law requires a speedy trial, fair notice of the proceedings, and all of that I have attempted to do that. *As I said this morning, for the last six or eight months I have tried very hard to get this case to trial simply because it's been on the docket forever. And further, some part of the fact that it could not be tried before now is related to the conditions of the courthouse in Prentiss County, which is kind of moot now because the venue has (R 5:88)been moved to Lee County and is to be tried here before a Lee County jury.* But again, there has been more than sufficient notice so that this case could be ready for trial, and we will try it on Monday morning. (R. 5:89).

On the day the trial was scheduled to begin the defendants filed a motion to dismiss or, alternatively, for a continuance. (Supp. R. vol. 1). The motion alleged an obvious conflict of interest and the failure of the prosecution to bring the conflict of interest to the court's attention. The asserted basis for the conflict was that one of the parties was operating the business at some points in time and that the other party was operating it at other times. The court took up the motion first.

THE COURT: Let the record show that the venire panel is outside the courtroom. The only matter that I know that we must take up before we proceed any further, the defendants have filed a motion to dismiss which was filed this morning.

Mr. Waide, because you are so recently involved in this case, I'll entertain this motion, otherwise I wouldn't.

MR. WAIDE: May it please the court. Your Honor, the indictment in this case charges embezzlement. It charges both defendants with embezzlement. *There's extensive discovery in the case, boxes of materials, but I can't see anything that identifies which defendant is charged with embezzlement at which times. And I also know that the proof is going to show that at various times, it goes on for 17 years, but (R. 5:91) at various times one of the defendants wouldn't even been working in the business during some of those times. There's an obvious conflict of interest.* It's obvious that one attorney should represent one defendant and should argue that they

10

haven't shown that my defendant was even working there at that particular time. So there's an obvious conflict of interest, and the prosecution knowing this case has gone on for 17 years and investigating it would have certainly known that from time to time which one of them was active in the business. *And one lawyer can't very well point the finger at one defendant and not at the other one* and say, Well, my -- for example, I might say the last three or four years Mr. Salts has been working outside this business, hasn't even been involved in the business. *But it's hard to make that argument representing both.*

There are two cases, Your Honor, that say that a defendant when there's an apparent conflict of interest must be warned by the prosecution. It's the prosecution's duty to bring it up to the Court, to notify the Court of the potential conflict, bring the defendant there and either see that there's an intelligent waiver done, that they waived the right to conflict-free representation or see that separate counsel is secured. And I cite (R. 5:91) Mississippi Supreme Court case in *Littlejohn v. State*, 593 So.2d 20. Same holding by the Fifth Circuit in 540 So.2d 1251.[6] I have these cases, I apologize for not having a copy for counsel, but I have a copy I'd like to show the Court. Should I show these to counsel first?

THE COURT: Let him look at them. Mr. Howard?

MR. HOWARD: *Your Honor, as you recall, on the 28th of September we had a hearing in this matter at which time the defense attorney stood up, I believe it was Mr. Michael Thorne, and represented to this Court that they would not be asking for severance in this case between the defendants. And you confirmed that on the record while the defendants were sitting in this courtroom, and we proceeded from that matter.*

THE COURT: Mr. Waide, do you have anything further?

MR. WAIDE: Your Honor, my response to that is of the law requires that the defendants be addressed individually, that the prosecution bring it to the Court's attention, and that they be addressed individually. *The attorney can't waive a conflict of interest. They have to be addressed individually and asked whether they waive the conflict of interest* and consent to one lawyer representing both of them. And the (R. 5:92) duty was on the state, your honor, not just the defense counsel, but on the State to bring it to the Court's attention according to those cases.

MR. HOWARD: *Your Honor, this matter was brought to the attention of your Honor as we met in chambers, and the matter was thoroughly discussed, and the defense attorney discussed this matter with his clients.*

MR. WAIDE: Your Honor, if he's going to argue that, then I'd like to put the clients on to ask them whether it's ever been this addressed with them. But it has to be addressed by the court in open court, not outside the court.

THE COURT: *You issue an instanter subpoena for Mr. Thorne and get him in to testify about this matter.*

*Now, if we're going to have the hearing, we're going to put Mr. Thorne on the stand, too, and find out what the discussion was. My recollection is that all this*

---

[6] The cite is apparently to *United States v. Alvarez*, 580 F.2d 1251 (5th Cir. 1978).

*was aired in chambers and in open court, and this is another of the last-minute tactics -- I'm not going to grant a severance, a continuance or anything else.* We're going to try it. It's taken me six months in an effort to get this thing to the courthouse as it is. And Mr. Waide, I understand the you have just come into this case. Because of that, that's the only reason I even took the matter up at all. But we are [R.5:93] going to proceed with the trial of the case. Is there anything else that we need to put in this record? (R.5:94) (Emphasis added).

The trial court did not hold a hearing and permitted no testimony from the Saltses or Thorne regarding any alleged off-the-record waiver. The court did not at that time or any other in the record address the issue of a conflict of interest with these two defendants individually. The court did not look into the extent that any conflict existed between the two defendants.

The trial proceeded. Waide's opening argument suggested that what the proof would show was that the Saltses had over 3,000 customers and that for the 17 year time period, all the state could find was five customers accounts where some of the premiums didn't get properly credited. (R. 6:158). He also suggested that the prosecution had grown out of bitter civil disputes with Gulf National, deriving from that company's desire to take the Saltses' business away from them.

THE STATE'S CASE IN CHIEF

Walter Blessey a former chief financial officer with Gulf National testified to its various corporate incarnations and acquisitions. He also explained that small burial policies, such as those sold by Gulf were called industrial policies. Reserves were required for this type of insurance. Burial associations which were owned by and tied to particular funeral homes sold what was known as Class A policies. The burial associations were not required to maintain reserves. Gulf National was owned by the O'Keefe family. From 1994 through its final acquisition by another company, Gulf National used funeral homes acted as agents to sell their polices and to routinely handle collecting the premiums for Gulf National. They were to report on premiums collected and forward

12

100% of the premiums to the insurance company. Commissions would then be sent back to the funeral homes. The insurance company would post the payments. Typically a 30 day grace period was allowed before a policy would lapse.

Gulf National relied on Michael and Marie to collect and report premiums to them. Blessey testified that the individuals named in the indictments had one or more policies with Gulf National. These individuals called to inquire regarding the status of their policies. A review of the records showed that Gulf National had not received premiums and the policies had lapsed. When these individuals furnished proof that it paid the Saltses, the company had to give them credit and reinstate their policies.

Blessey testified that prior to terminating the Saltses as agents there had been problems with receiving premiums. He spent two years asking for an accounting on the premiums. His suggestion that Gulf policyholders submit payments to Gulf directly was rebuffed by the Saltses. The company finally delivered an ultimatum to do the reports and remit premiums or be terminated. The Saltses were terminated in either November or December, 1994.[7] Gulf National received no premiums through the Saltses after June of 1995.

After the termination Gulf sent letters to every policyholder advising them to pay Gulf directly. They ran notices in the newspaper regarding the termination of the agency with Salts Funeral home. Very few of their former customers paid Gulf National directly. Gulf National filed suit against the Saltses to restrain them from collecting premiums The cross examination focused primarily on the protracted and bitter flurry of litigation between the Saltses and Gulf National after the termination of their agency.

---

[7] Blessey originally misstated the year and was corrected via an objection by defense counsel.

13

The state then presented the testimony of the five Salts funeral home customers. Paula Cox testified that she had several Gulf National policies and no Class A policies. She made payments on the policies to the Saltses. She received a letter from Gulf National and talked to Michael about it. He assured her that as long as she remained with his business that everything was fine and that she could throw away the Gulf National letter. After this conversation she continued to make payments through the funeral home. She intended the payments to go to Gulf.

In the fall of 2000 Cox found out through others that her policies were lapsed. Upon providing proof of payments made to Salts Funeral Home, Gulf National reinstated the policies. She identified one of her checks which showed Michael Salts' endorsement. The check had been cashed at a local gas station. Her other checks were given to Michael. The testimony of the others was similar, with the addition that those customers who were shown as having been switched over to Magnolia Guaranty denied that they knew of or authorized the change. (R. 6:297, 311). One client testified that he was purchasing an insurance policy through Michael and made payments on the policy but was never provided with a copy of any policy. (R: 7:321). The cross examinations largely focused on trying to establish that payments made were in fact for Class A coverage.

The state also called Janie White, an office manager with Gulf National through whom they introduced the Gulf National payment records for the individual policy holders listed in the indictment. White compared the proofs of payments provided by the Saltses customers with Gulf National's payment records. The records did not show any of the payments in evidence received by the Saltses had been forwarded to Gulf National. White admitted on cross examination that the payment records were limited to the time after 1994 and the termination of the Saltses as agents for Gulf National. She testified that her company would be dependent on the Saltses to advise them as to what they had collected and from whom. She admitted on cross examination that Gulf did not

have any records to say what the monies being paid to the Saltses were for, whether for Class A or for Gulf. She further admitted that disputes between Gulf and the funeral homes about whether payments were properly credited by the insurance company were routine. (R. 7:380-433)

Robert Spell, the Chief Executive Officer of Magnolia Guaranty, testified that he approached the Saltses about becoming agents with his new company after their termination by Gulf. Magnolia was also in the business of providing industrial policies. As agents funeral homes would sell the policies and and collect the premiums. Magnolia did business with the Saltses from the latter part of 1994 to latter part of 1996, with a period of interruption when Marie's insurance license lapsed and could not be renewed. When the Saltses got a licensed agent, Geraldine Bearden, they reopened the relationship. Three of the Salts customers listed in the indictment had been listed as policy holders with Magnolia. No premiums were received by Magnolia Guaranty on any of the policies after the fall of 1996. (R. 7:434-8:490)

An investigator with the Attorney General's office testified to his investigation. Through him spreadsheets were introduced into evidence. These spreadsheets summarized the financial records showing the receipts going into the Salts Funeral Home and the failure to make payments to either Gulf National or Magnolia Guaranty. (R. 8:493-529)

THE DEFENSE'S CASE

The defense presented two witnesses. Thomas Keenum, an attorney who had represented the Saltses for a number of years, and Marie Salts. Keenum provide some background on the disputes between Gulf and the Saltses including the fact that the Saltses had, had claims that Gulf was not paying and properly crediting them for commissions. He testified that funeral homes would make most of their money from the funerals themselves and not from insurance policies. Because the insurance policies would provide a source for the payment of funeral expense, it would be in the

15

best interests of the Saltses to make sure that premiums were paid.  He discussed the bitter disputes that broke out between Gulf and the Saltses upon termination regarding the handling of the Salts/Gulf customers.  (R. 7:367-380)

Marie Salts testified.  She had begun selling insurance around 1982.  On November 29, 1994, the Saltses received a letter advising them they were no longer in business with Gulf National. She said they put a notice on the door of the funeral home stating that they no longer could accept premiums on behalf of Gulf National.  She also testified that they had sent letters to their customers advising them that the funeral home could no longer accept premiums on behalf of Gulf National.

The Saltses had two burial associations for the sale of Class A coverage, the Booneville Burial Association and Northeast Burial Association.  She testified that it was in their best interests to see that policies were paid because it helped to pay for funerals that a lot of their clientele could not otherwise afford.  She testified that there were problems with the insurance company not giving them proper credit for payments made and not paying commissions properly.  Marie had demanded an audit in 1992 and the Saltses had paid the shortage shown on the audit from their own pockets.

Marie also testified that there was trouble starting in 1991 when they built a chapel financed by an insurance company.  She said that Mr. O'Keefe, one of the owners of Gulf National had wanted them to sell the funeral home to him.  After they refused he got mad and began a personal vendetta against them.  She said they had not collected any monies for Gulf after 1994.  The money belonged to BBA or NEA or it wasn't being accepted. She took care of getting the money to the right place before Bearden came on with the funeral home.   Bearden, because she had an insurance license, made phone calls to see if the Saltses customers wished to switch policies to Magnolia.

In 2002 the funeral home burned.  She tried to keep the business going after that by holding funerals at churches.  Michael had started selling cars in 2002 right after the fire in order to help

16

support the family. Marie testified that the monies she received after 1994 were for Class A coverage or in one case for merchandise. She said she relied on Bearden to keep the records on the Magnolia policies. She claimed to rely on Bearden to tell her what monies were due Magnolia. In addition to collecting monies for Class A coverage, Marie testified to the provision of certificates of credit to their customers, particularly in the case of one customer whose child was already suffering from cancer and therefore could not receive insurance coverage. This was the same individual who testified that he believed he was receiving an insurance policy, but had never received a copy of the policy. Marie claimed in her direct testimony that there had been problems with two former employees having cashed checks. She claimed that neither she nor Michael had embezzled any money.

STATE'S REBUTTAL

The state's sole rebuttal witness was Ms. Bearden. She worked for the Saltses for only a part of 1996. She did receive monies from customers during her employment but said she had nothing to do with forwarding it to the insurance companies. She had nothing to do with collecting checks that were admitted into evidence and dated during 1998, 1999, 2000 or 2003 since this was after she left Salts Funeral Home's employment. Michael had filled out the Magnolia insurance applications and had her sign them. She had not talked to most of the people for whom she signed applications.

GROUND ONE

The Saltses assert they were "denied effective assistance of counsel and a fair trial because they had no attorney who was prepared for trial." The Mississippi Court of Appeals held that the Saltses were not deprived of their right to effective assistance of counsel ruling that the Saltses were at least complicit in their attorney's repeated requests for continuances. The court determined that the Saltses had waived their rights.

The Saltses complain that this decision is contrary to clearly established law as established by the Supreme Court of the United States of America. The Saltses claim that their right to a fair trial and to assistance of counsel was compromised by the lack of time for their attorney to prepare for trial arguing that the time restraints were unreasonable under the circumstances. *Powell v. Alabama*, 287 U.S. 45, 71 (1930). Thorne was not prepared for trial due to the illnesses in his family and their new counsel Waide was not allowed adequate time to prepare after Thorne's discharge. The Saltses urge that the trial court's "[m]yopic insistence on expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). The Saltses argue that the state court decision finding that they waived their right to counsel by implication and by neglect is contrary to the law that indulges in all reasonable presumptions against the waiver of important constitutional rights. They insist that the law rather requires a conscious, knowing and intelligent waiver of a known right.

The respondents frame the issue differently. The respondents assert that the claim is simply whether the Saltses are entitled to relief based upon the failure of the trial court to grant them a continuance. "[O]nly an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to counsel." *Morris v Slappy*, 461 U.S. 1, 11-12 (1930). quoting *Ungar*, supra, 376 U.S. at 589. The respondents note that the petitioners must not only show an abuse of discretion in the refusal to grant a continuance but must show that the granting of a continuance would have permitted the introduction of evidence that would likely have altered the outcome of the trial, *Schrader v. Whitley*, 904 F.2d 282 (5th Cir. 1990), or that the "denial was so arbitrary and unreasonable as to violate constitutional principles of due process." *Newton v. Dretke*, 371 F.3d 250, 255 (5th Cir. 2004).

18

The record in this action established that Thorne was not prepared for the trial. He filed a motion for continuance on September 28, 2005, seeking a continuance due to "illness in Defendant's counsel's immediate family" and requesting "additional time in which to prepare for the trial of this matter to properly defend this case." (R. 2:275). The trial judge was told by the Saltses that Thorne's father was dying. The record shows that his father in fact died a week after the trial. Thorne had indicated in an earlier motion for continuance that an accountant might be needed to defend the case. No accountant was ever retained, so far as the record shows. The Saltses told the court, and it was uncontradicted, that as of the Friday before trial, Thorne had not subpoenaed a single witness on behalf of his clients. The Saltses also told the judge that they had repeatedly tried to talk to their lawyer but that he was never at his office so they could confer with him to prepare the case. The trial judge, while in one place prior to the trial referring to Thorne as a "thoroughly competent attorney" did at the motion for a new hearing candidly admit that Thorne's representation had been very troublesome in this instance. The trial judge found Thorne's representation had been sorely lacking. He candidly told the Saltses and their counsel,

> I can tell you and the Salts that I personally insisted that Mr. Thorne file motions, and only then did he respond with motions that I insisted with him that he, if he wished to ask for a change of venue that he do that. Finally he did. And this went on over a period of months, not days or weeks for that matter. This went on for a long time.
>
> I understand that he had some personal problems and I hope that you understand, Mr. Waide, and that the Salts understand that I am, I'm a very sympathetic of personal problems, loss of family, illness and that kind of thing. But nevertheless, I am charged with the responsibility of moving the business of this Court forward. (R. 10:796-97)

The record establishes that Thorne was not prepared to defend his clients. The trial court was well aware, and had been aware, of the problems with Mr. Thorne's representation in this case for an apparently extended period of time. The Mississippi Court of Appeals in its decision based

on this record found that Thorne was in fact not prepared for trial, at least largely because of an multitude of personal problems. There could be no better cause for discharging an attorney than the failure to prepare to defend serious criminal charges. The state court cites to state case law that correctly notes that a voluntary change of counsel during or immediately prior to trial does not necessarily entitle a defendant to a continuance. How is a change of counsel from an attorney the courts have found to be unprepared to defend his clients deemed voluntary?

Nevertheless, the Mississippi Court of Appeals found that the Saltses were guilty of procrastination. It found that they had known for some time that their attorney was not preparing for trial. The court cites to nothing in the record to support this assertion, nor does the undersigned find anything in the record to support this factual finding. There is nothing in the record to suggest that the Saltses should have been on notice of the need to discharge their counsel sooner. Nothing in the record supports any assumption that the Saltses had slumbered on their rights. There is no showing in the record that they realized what the trial judge realized--that their defense was derailed--until immediately before the trial.

The record also shows that while Thorne filed multiple motions for continuance, the reason for two of the continuances was recusal triggering conflicts with two different circuit judges and at least one was due to the unavailability of the Prentiss County courthouse. Two of Thorne's motions for continuance were obviously well taken on the face of the motions; his wife's need for out-of-state medical treatment and his father's hospitalization. The final motion for a continuance, given his father's death shortly after trial was meritorious. There appears to be one continuance that would not have otherwise occurred but purely for Thorne's and/or the Saltses benefit during the course of the case. Given the delays in the case and the fact that the court and Thorne were the cause for the

20

delays not the defendants, the sudden rush to trial speaks of too much concern for speed and not enough for justice and due process.

The Mississippi Court of Appeals decision holds that these defendants forfeited their right to effective assistance of counsel by not acting swiftly enough to fire their attorney. Not only is this finding unsupported by the record, it is contrary to law and an unreasonable application of federal law to the facts of this case. "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938) quoting *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393 (1937) ; *Hodges v. Easton*, 106 U.S. 408, 412 (1882) and *Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292, 307 (1937). To suggest that they waived their right to effective assistance of counsel because they did not pick some earlier unspecified time to discharge Thorne is unreasonable, particularly where the trial court had been at least as complicit as the Saltses in allowing the delays and unquestionably more knowledgeable of their peril because of the delays. Though charged with the duty to protect their constitutional rights, the trial court provided no warning to the Saltses of the fact that their lawyer's continuing problems might mean that they needed to find alternate counsel.

The Mississippi court's decision seems to put a stamp of approval on leaving the Saltses in a terrible dilemma. The decision would hold these laypersons to have waived their right to the effective assistance of counsel by not realizing quickly enough that their attorney was unprepared and not firing him quickly enough. This is especially harsh when the attorneys personal plight is naturally going to be justly deserving of sympathy. Given that the right to counsel is one of the most

fundamental of all rights, the court seems to be demanding that lay people navigate between Scylla and Charybdis accurately or be deemed to have waived their rights.

While the trial court and state court committed grave error, nevertheless, the undersigned recommends that no relief be granted on these grounds. Whether considered as a right to counsel claim or a denial of a continuance claim, the Saltses must show that they have been prejudiced by the actions of the trial court. While Waide's time to prepare was limited, in fact extremely limited, he nevertheless defended these individuals capably. The record does show that Waide had not had the opportunity to interview any prosecution witnesses, through no fault of his own. That would be an action required as part of professionally reasonable preparation. *Richards v. Quarterman*, 2009 WL 111177 (5th Cir. April 27, 2009). In spite of this unavoidable failure to investigate, Waide appears to have in fact been well prepared. The Saltses have not shown any additional witnesses that could have and should have been produced at trial, had they been granted additional time. They have not shown any documents that could have been used differently or attacked successfully had their new attorney had additional time to prepare. There is no showing that an expert witness was in fact needed for the trial or that any helpful expert testimony could have been obtained with additional time.

The record shows that their present counsel in fact had a coherent and consistent theory of defense. His conduct in the courtroom shows a good if not perfect command of the facts of the case. Under very adverse circumstances, counsel performed capably, even admirably. There is simply nothing in the record to suggest that additional time to prepare the defense would have been likely to have yielded a different result. A reading of the record convinces the undersigned that the denial of the continuance while unjust, did not render the trial unfair.

22

<u>GROUND TWO</u>

The Saltses in their second ground assert "they were denied their constitutional right to effective assistance of counsel because the trial court never personally addressed them to determine whether they wished to waive any conflict of interest that existed between them." They assert that there was timely objection by counsel to being compelled to represent both of them at trial and that they were, therefore, entitled to an automatic reversal under *Holloway v. Arkansas*, 435 U.S. 475 (1977). They assert that the decision of the Mississippi Court of Appeals holding that they failed to show an actual conflict of interest and that the trial court was therefore not required to make any inquiry into the propriety of joint representation is contrary to clearly established federal law as determined by the Supreme Court of the United States. The respondents contend that the Saltses, in order to prevail on their claim must show an actual conflict of interest that adversely affected counsel's representation relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980)(hereafter referred to as *Sullivan*).

The Mississippi Court of Appeals held that the Saltses needed to and failed to show an actual conflict of interest in order to trigger any duty of inquiry by the judge regarding a conflict of interest citing the *Sullivan* case and Mississippi case law. The court further rejected Farese's motion to withdraw as proof of an actual conflict of interest. Alternatively, the Mississippi court found that the Saltses had waived the conflict of interest though outside of the record on appeal.

<u>DID THE SALTSES WAIVE ANY CONFLICT OF INTEREST CLAIM?</u>

The simplest portion of the second claim to decide is the finding by the Mississippi Court of Appeals that the Saltses had waived any existing conflict of interest. This holding is contrary to federal law as established by the United States Supreme Court; an unreasonable application of clearly established law; and an unreasonable finding of facts based upon the record.

23

The Mississippi Court of Appeals found that the Saltses had waived any conflict of interest based upon discussions by the prosecutor and the trial judge about what happened in a pretrial hearing attended by Thorne but not Waide. The prosecutor and the judge both referred to discussions in chambers during the course of an earlier hearing.. The Mississippi court found a waiver based upon the following discussion immediately prior to trial.

> [PROSECUTOR]: Your Honor, as you recall, on the 28th of September we had a hearing in this matter at which time the defense attorney who stood up, I believe it was Mr. Michael Thorne, and represented to this court that they would not be asking for severance in this case between the defendants. *Salts v. State*, 984 So. 2d 1050, 1062-63. XY
>                    ****
> [DEFENSE ATTORNEY]: Your Honor, my response to that is that the law requires that the defendants be addressed individually, that the prosecution bring it to the Court's attention, that they then be addressed individually. The attorney can't waive the conflict of interest. They have to be addressed individually and asked whether they waive the conflict of interest and consent of one lawyer representing both of them.
>                    ****
> [PROSECUTOR]: Your Honor, this matter was brought to the attention of Your Honor as we met in chambers, and the matter was thoroughly discussed, and the defense attorney *discussed this matter with his clients*.
>
> [DEFENSE ATTORNEY]: Your Honor, if he's going to argue that, then I'd like to put the clients on the stand and asked them whether it's ever been addressed with them. But it has to be addressed by the court in open court, not outside the court.
>
> [THE COURT]: You can issue an instanter subpoena for Mr. Thorne and get him to testify about this matter. Now if were going to have the hearing, were going to put Mr. Thorne on the stand, too, and find it out what the discussion was. My recollection is that all this was aired in chambers and in open court...." *Salts*, 984 So.2d at1063.

The court however did not proceed to a hearing, but started the trial.

The Mississippi Court of Appeals seized on this recollection about what had occurred in the pretrial hearing as sufficient basis on which to find that there had been a waiver of the conflict of interest. Strangely the opinion does not refer to the record of this earlier hearing. The record of

24

the earlier hearing in fact shows that the topic under discussion at the pretrial hearing was not conflict of interest but whether or not the Saltses would seek a severance of their trial, i.e, would request that they be tried separately. The record of that hearing does not support the trial judge's or prosecutor's recollection as shown below.

THE COURT: *In chambers during a discussion concerning the general handling of the case, there was some discussion about a severance likely to be requested by one or both of the defendants, and that was predicated on the anticipated revelation during the trial of a prior -- -- a prior -- -- not a, but prior convictions of Michael Salts.* And I'd like to get that matter out of the way. If there's going to be a severance it needs to be now, because after today I intend that the matter for trial or trials is resolved.

MR. THORNE: *Your Honor, I think the court's ruling on the state's motion to amend indictment to allege habitual offender status was the condition that would trigger that possible motion for severance.*

THE COURT: Well if I understand, the State is entitled to amend, and I will allow them to amend the indictment to charge habitual status of Michael Salts.

MR. THORNE: And in lieu of that ruling if the Court does grant the State's motion to amend as to Michael Salts on habitual offender status, let me confer with my clients just a second.

THE COURT: All right.

(BRIEF PAUSE IN PROCEEDINGS)

MR. THORNE: *Your Honor, after conferring with my clients, the indication is that they do not want to move for a severance at this point. We understand that this information will not be presented to the jury in any manner indicating that this is a habitual charge as to Michael Salts.* However, if the door be open during the testimony as to any prior felony convictions, then that information, we understand, would be presented before the jury, but not in any manner, so to speak, as actually charging him as an habitual. Is that the understanding?

THE COURT: Well, *the State has again indicated that if he takes the stand and testifies, they intend to ask him about any prior felony record that he might have.*

MR. THORNE: Yes, sir.

THE COURT: *And that, of course, is relevant as to him only. It has nothing to do with the defendant Marie Salts.*

MR. THORNE: Yes, sir. *And as long as the State does not imply or indicate to the jury of the habitual status of the charge, then I think we're fine.* If they go strictly to the fact that yes, there was more than one prior conviction, and then I think we're all right in going forward as we are.

THE COURT: How many does he have? Obviously he's got at least two prior convictions.

MR. THORNE: There's five.

(R. 5:3-5)

25

The record from the hearing shows only that the subject matter of discussion was severance and not conflict of interest. The concern voiced by the Thorne is whether evidence admissible as to Michael only would be introduced at the trial. The respondents argue that this discussion and the withdrawing a request for severance was tantamount to a waiver of conflict of interest. It is not. A severance may ameliorate a potential conflict of interest problem. *Burger v. Kemp*, 483 U.S. 776 (1981)(defense counsel's partnership with a lawyer representing the defendant's co-indictee in a separate prosecution did not constitute active representation of conflicting interests). A severance may have absolutely no impact on ameliorating a conflict of interest. *United States v. Alvarez,* 580 F.2d 1251 (5th Cir. 1978)(Attorney was laboring under an actual conflict of interest where he also represented prosecution witnesses who had pled earlier pled guilty and then testified against the remaining defendant pursuant to their plea agreements). A severance or separate trials may exacerbate a conflict of interest problem and/or lead to the creation of an actual conflict of interest. See *Sullivan*, 446 U.S. 335 (Defense counsel admitted that concern over the impact on co-defendants influenced a tactical decision in the first trial to rest without putting on a defense. The first defendant was convicted and the later tried co-defendants acquitted.) But severance is still an issue separate and distinct from conflict of interest.

A severance is typically sought to avoid potential prejudice to one defendant by having evidence that is only admissible against a co-defendant placed before their jury. That is precisely the concern being discussed in the pre-trial hearing. The possibility of a severance was discussed because of concern that a jury considering Marie's guilt might hear that her husband had multiple felony convictions for making fraudulent representations to Prentiss County. The danger of facing prejudicial evidence admissible only as to a co-defendant or any perceived disadvantage to be trying

26

with and "lumped together" with another defendant is quite simply not the same as the hazard of facing a trial with an attorney whose loyalties are divided.

That there was in fact no waiver of the conflict in this case is made even clearer by later statements by the trial judge. In ruling on the motion for a new trial the judge said, "*I don't recall any particular argument concerning the conflict of interest. There was some discussion of a severance*, which I denied." (R. 10:798). There being no indication in the record that there was any off-the-record waiver of a conflict of interest, and certainly no contention that a *Holloway* inquiry was conducted, the holding of the Mississippi Court of Appeals that the Saltses waived any conflict of interest is an unreasonable finding of fact based upon the record. Any determination that the decision not to pursue separate trials is tantamount to a waiver of a conflict of interest is both an unreasonable finding of facts and an unreasonable application of the law to the facts.

Finally, there is nothing in the record before this court showing that any hearing was held that addresses whether there was a conflict of interest, the extent of any conflict, what steps were necessary to ameliorate any potential conflict. There is no waiver of any conflict on the record. Even if the pre-trial statements made by the judge and the prosecution accurately reflect chambers conferences, they nevertheless do not establish any waiver of the right to effective representation by conflict free counsel. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969) (A guilty plea accepted without an affirmative showing on the record that it was knowingly and voluntarily entered was reversible error). Waiver cannot be presumed from a silent record. *Carnley v. Cochran*, 369 U.S. 506, 516 ( 1962)("Presuming waiver from a silent record is impermissible."); *Glasser v. United States*, 315 U.S. 60 (1942)(Attorney-defendant did not waive his right to conflict-free counsel where he initially objected but was silent when his attorney consented to be appointed as counsel for a co-defendant); *United States v. Alvarez*, 580 F.2d at 1259 ("It is axiomatic that an accused may waive

his right to conflict-free counsel, *Gray v. Estelle,* 574 F.2d 209, 213 (5th Cir. 1978), but such waivers are not to be lightly or casually inferred and must be knowingly and intelligently made." citing *United States v. Mahar*, 550 F.2d 1005 (5th Cir. 1977));  Without a record to support the position, there is simply no waiver of the conflict of interest.

<u>SUPREME COURT MULTIPLE REPRESENTATION CONFLICTS CASE LAW</u>

This court is called on to decide which of two cases, both dealing with conflicts of interest arising out of multiple representations, is controlling in this case.  The petitioners contend that *Holloway* is controlling.  The Mississippi Court of Appeals applied *Cuyler v. Sullivan*.  Because this court is presented with differing positions regarding which United States Supreme Court case applies to this case, a review of the jurisprudence and the factual scenarios from which the case law arose is helpful.  The facts of those cases are compared and contrasted with the facts in Salts to determine which case states the applicable rule of law and if the decision of the Mississippi court is either contrary to or an unreasonable application of federal law.

*<u>Glasser v. United States</u>*

One of the older cases addressing the right to effective assistance of conflict free counsel is the case of  *Glasser v. United States*, 315 U.S. 60 (1942) (Superseded by statute on other grounds, *Bourjaily v. United States*, 483 U.S. 171 (1987)).  Glasser was an  assistant United States Attorney in charge of prosecuting liquor cases in the Northern District of Illinois.  Glasser was prosecuted for conspiracy to defraud the United States of honest representation in court, arising out of an alleged scheme for soliciting bribes in connection with the prosecutions.  One of his co-defendants was Kretske, also an assistant United States Attorney, who had assisted Glasser in the prosecution of liquor cases.

28

Glasser retained Stewart to represent him in the case. On the day set for trial Kretske's attorney moved for a continuance which was denied. The court then appointed one McDonnell to represent Kretske. When McDonnell advised the court that Kretske did not want McDonnell to represent him, the court suggested that Stewart represent both Glasser and Kretske. Stewart pointed out to the court that there were 'some little' inconsistencies in the defenses. He also told the court that it was anticipated that there "will be conversations where Mr. Glasser wasn't present," but where Kretske and others discussed giving money "to take care of Glasser." *Id.* 315 U.S. at 68. The lawyer told the judge that Glasser "feels that if I represent Mr. Kretske the jury would get an idea that they are together...." *Id.* The court suggested that there would not be any connection seen if the jury understood that Stewart had been appointed to represent Kretske rather than retained.

When the court suggested that this would be a favorable arrangement for Kretske, Glasser personally said, "I think so too, if he had Mr. Stewart. That's the reason I got Mr. Stewart, but if a defendant who has a lawyer representing him is allowed to enter an objection, I would like to enter my objection. I would like to have my own lawyer representing me." *Id.* at 69. Thereafter, Stewart acquiesced in being appointed to represent Kretske also. Glasser neither voiced further objection, nor expressly waived his earlier objection.

At trial there was substantial testimony about Kretske having various conversations about getting money for Glasser to take care of prosecutions on behalf of accused persons. These conversations were outside of Glasser's presence. Glasser contended there was not sufficient outside evidence of a conspiracy to render Kretske's statements admissible against him and the Court agreed. Nevertheless these conversations were admitted without objection by Glasser's attorney. Glasser asserted that his attorney had foregone the objections that were beneficial to him,

29

in consideration of Kretske's interests. The Court found that Stewart's actions were indicative of his struggle to serve two masters during the trial.

In the Saltses' case both Farese and Waide indicated conflicts of interest between the two defendants.[8] The record demonstrates that Michael received most of the funds from the customers and that Marie did the bookkeeping. With the Saltses there appear to be two roads that could be traveled. With two attorneys the Saltses would each have a choice to mount a consistent, united defense, as was done at trial, or to attempt to exculpate themselves by pointing at the other's role. The evidence in the state's case points most strongly at Michael. During the case in chief Marie is mentioned only in passing. By comparison Michael is portrayed as the head of the business not only in dealing with the customers but in selling policies, collecting premiums and even offering assurances that nothing was amiss when rumors to the contrary began to circulate in the community. Marie's testimony actually showed more involvement by her in whatever had happened than the state's case. With only one attorney, there was no choice but to attempt to exculpate both parties.

In addressing the issue of prejudice to *Glasser* the court noted,

> To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Gretske is at once difficult and unnecessary. The right to have assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. (Citations omitted). Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting that counsel undertake to concurrently represent interests which *might diverge* from those of his first client, *when the possibility of that divergence is brought home for the court*." *Id*. at 75-76.(Emphasis added).

---

[8] The Mississippi Court of Appeals found Farese's motion to be ambiguous. This finding is discussed in more detail later in this report and recommendation.

Glasser's conviction was reversed because the trial court was advised of "the *possibility* that conflicting interests might arise." *Id*. at 76. (Emphasis added). In the case of the Saltses, the trial court was likewise advised in both 2003 and immediately prior to trial in 2005 of at least the possibility of conflicts of interest but took no steps to remedy the problem. Both lawyers, who were in the best position to anticipate a conflict of interest, told the court that there was an *actual* conflict of interest. The conviction in *Glasser* was reversed not because the court found that Stewart had rendered ineffective assistance of counsel but because the representation "was not in as effective as it might have been if the appointment had not been made." *Id*.

### *Holloway v. Arkansas*

The next major case addressing conflicts of interest and the right to effective assistance of counsel is *Holloway v. Arkansas,* 435 U.S. 475 (1977). One public defender was appointed to represent three co-defendants in a state criminal trial. The three men Holloway, Campbell and Welch were all accused of robbing a Little Rock, Arkansas restaurant and terrorizing its five employees. Two female employees were raped during the course of the robbery. One of the defendants, Campbell, had purportedly confessed to the police that he had been a participant in the robbery but had not taken part in the rapes.

The public defender both prior to and at trial filed a motion requesting the appointment of separate counsel advising the court that he was confronted with the risk of representing conflicting interests. The trial court denied the motions without hearing. None of the employees was able to identify all three defendants, but all three had been identified as robbers by at least one of the employees. One of the rape victims identified Holloway as one of her attackers.

Against the advice of their attorney, each of the defendants decided that he would testify in his own behalf. At this juncture the public defender again raised the conflict problem, telling the

judge he could not cross-examine any of the defendants because he was privy to confidential information from each. The trial court made the public defender continue with the trial.

Each of the three defendants testified in narrative form without questioning due at least in part to ethical concerns related to not assisting with perjury. Each denied having been present at the time and place of the robbery. Holloway presented his brother's testimony to corroborate his claimed alibi. Campbell denied having made any confession to the arresting officers. Any reference to Campbell's co-defendants was redacted from the confession. As with the Saltses none of the defendants said anything designed to incriminate the other defendants and each proclaimed his innocence. Their alibi claims were rejected by the jury which convicted them all.

The Court noted that since *Glasser* the lower courts had taken divergent approaches to the cases where counsel did nothing to advise the court of the potential conflict between client's interests. The appellate courts had disagreed on how strong the showing of a conflict had to be and on how certain the reviewing court needed to be that the asserted conflict existed before it would conclude there had been a deprivation of the right to effective assistance of counsel. The lower appellate courts had also differed on the question of the "scope and nature of the affirmative duty of the trial judge to assure" the defendants were not deprived of effective assistance of counsel due to joint representation of conflicting interests. *Holloway*, 435 U.S. at 483. These questions were expressly reserved as not necessary to the resolution of Holloway's claim, finding that the reasoning in *Glasser* controlled the determination of *Holloway*. "This reasoning has direct applicability in this case *where the 'possibility of [petitioners'] inconsistent interests' was 'brought home to the court' by formal objections, motions, and defense counsel's representations*." *Id.* at 485. (Emphasis added).

Clearly, there was an objection made immediately preceding the trial by Waide, but there had also been Farese's motion to withdraw due to a conflict of interest two years earlier. Still there was no hearing held into the conflict problem. Two of the three attorneys in the case told the court the same thing--that a conflict problem existed in the representation of the Saltses by one attorney.

### *Cuyler v. Sullivan*

In *Cuyler v. Sullivan*, 446 U.S. 335 (1980) two privately retained attorneys represented three defendants accused of the same murder. The victims, a labor leader and his companion, were found shot to death at the labor leader's office. All three defendants were seen at the building immediately before the shooting. They appeared to be waiting on someone. The defendants suggested that a janitor then on duty leave and find another day to do his work. When the janitor refused, one of the co-defendants stayed with the janitor. Shortly after the victims arrived at the office, the janitor heard what sounded like a series of firecrackers going off. Sullivan's co-defendant then told the janitor to leave and not say anything. The janitor left. The victims' bodies were found the next morning.

The three defendants were tried separately. One of the attorneys admitted that he was concerned in Sullivan's trial about the potential impact on the other defendants' trials if the defense went forward with its proof in Sullivan's trial. The defense rested without putting on any proof and Sullivan was convicted. His co-defendants were acquitted in separate trials.

Sullivan sought federal habeas corpus relief alleging that he was deprived of adequate counsel because his attorneys had a conflict of interest. He did not argue that any state official knew or should have known about the conflict. In *Sullivan* the court answered the two questions expressly reserved in *Holloway*, namely "whether a state trial judge must inquire into the propriety of multiple representation even though no party lodges an objection" and " whether the mere

33

possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel." *Sullivan*, 446 U.S. at 345.

Because defense counsel has an ethical obligation to avoid conflicting representations and to notify the court promptly should a conflict of interest arise in the course of the trial, the court found that "absent special circumstances...trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Id*. at 346-47. "Unless the trial court knows or reasonably should know that a particular conflict exist, the court need not initiate an inquiry." *Id.* at 347. Therefore under the facts of the *Sullivan* case the trial court was under no obligation to inquire into the possibility of conflict.

In *Salts* the trial court was put on notice of the possibility of a conflict between the Saltses by the Farese motion to withdraw but made no inquiry. He was provided with further notice by the Waide motion to dismiss or continue because of the conflicts of interest. Thus *Sullivan* is not factually on point. *Sullivan* involved no notice, motion or reason to know of the conflict.

The *Sullivan* court next considered what showing of conflict was necessary to justify relief in the absence of a timely objection in the trial court. The Court acknowledged that under *Holloway* "a defendant who objects to multiple representation must have the opportunity to show the potential conflicts impermissibly imperil his right to a fair trial," *Id*. at 348, but unless deprived of an opportunity to make that showing in the trial court, there is no presumption that the possibility of a conflict in fact has deprived the defendant of effective assistance of counsel. The Court held, "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *Id*. at 348. The *Sullivan* holding itself shows that *Holloway* not *Sullivan* controls the determination of the Salts case. The holding in Sullivan must be inverted to make consistent with the facts in Salts.

34

Thus *Sullivan* mandates that "because the trial court failed to afford" the Saltses "an opportunity to show that potential conflicts impermissibly imperiled" their "right to a fair trial" this court "must presume the possibility for conflict has resulted in ineffective assistance of counsel."

Based on the foregoing review and comparison the undersigned finds that *Holloway* and its progenitor *Glasser* state the law applicable to this case. *Sullivan* is inapplicable.

<u>APPLICATION OF *HOLLOWAY* TO SALTS</u>

It is necessary to apply the holdings of *Holloway* to the facts of Salts. The Mississippi Court of Appeals was squarely presented with the issue of whether *Holloway* applied to the Salts case. The issue presented to the Mississippi court was phrased using language from *Holloway* and that case was cited to the court. Nevertheless, the Mississippi Court of Appeals ignored *Holloway* making no rulings or findings on the law and making no attempt to apply Holloway to the facts of this case. Because that court did not apply *Holloway,* it is incumbent upon this court to look at the record in the holdings of the Mississippi court to determine the appropriate application of *Holloway.*

First, the undersigned explicitly finds the Farese's motion to withdraw based upon conflicts of interest brought to the court's attention the "possibility of [petitioners'] inconsistent interests" and qualifies as a " formal objection, motion, and defense counsel's representations" under *Holloway*. As noted earlier Farese's motion stated: "Steven E. Farese, Sr. would submit that upon discussion of this matter with one of the Defendants that two separate irreconcilable conflicts arose. Based upon these conflicts, Defense Counsel is ethically and legally unable to defend either of these defendants. R. 1:60. The Mississippi Court of Appeals, because it did not consider *Holloway,* made no finding on whether this motion qualified as an "objection" under Holloway, but did reject the motion as proof of an actual conflict of interest. The Mississippi court stated,

35

This motion contains, at best, an inference that Farese may have encountered a conflict of interest due to his representation of both and Marie and Michael. However, it is also possible that Farese was indicating that, pursuant to his discussion with the Saltses, he discovered some other conflict that left him ethically unable to defend either Marie or Michael. We do not take the motion is proof that there was an actual conflict between Michael and Marie." *Salts*, 984 So.2d at 1061.

Whether Farese's motion is proof of "an actual conflict of interest" between the two petitioners is beside the point. Under *Holloway* the question is whether it is sufficient to trigger a duty of inquiry on the part of the trial judge. The obvious, apparent and most logical conclusion to be drawn from the motion to withdraw is that a conflict of interest existed between the two defendants. While as shown by Farese's affidavit there was a second conflict of interest growing out of the representation of a separate client, that type of conflict is routinely discovered by running a check for adverse parties. That Farese became aware of the conflict "upon discussion of this matter with one of the Defendants" strongly implies and would normally be taken by legal professionals to mean, what Farese's affidavit submitted to this court makes certain--that he discovered an actual conflict of interest existed between the two defendants. According to Farese's affidavit the problem arose because one of the clients, shown by trial testimony to be Marie, handled all the money and would have been responsible for any failure to handle the money properly. [9]

---

[9] The state has also submitted an affidavit from Farese that states that he discussed the conflict problem with Marie Salts and that he thinks he also discussed the conflict problem with Michael Salts. Whatever Farese may have said privately to his clients has no application under *Holloway*. *Holloway* speaks to the duty of the trial court to assure that there is a knowing and intelligent waiver, no conflict or separate counsel. Presumably any lawyer who raises the issue with a court will also have some discussion with the client before a *Holloway* hearing. The affidavit only says that the conflict of interest was discussed with Marie and probably with Michael and that Farese advised them that they might want to obtain separate counsel. This conclusory affidavit is insufficient to establish any waiver of the right to conflict free counsel by either of the Saltses.

The interpretation of Farese's motion as ambiguous about what the conflict of interest was is strained at best. The motion is just ambiguous enough to raise a possibility that it referred to a conflict other than the one between the defendants. The motion in fact refers to two conflicts of interest. But the undersigned finds that even if deemed somewhat ambiguous, the motion raised conflict of interests as a problem in the case and imposed upon the trial judge the obligation to inquire into the conflict of interest pursuant to *Holloway*. If being told that counsel was "pointing out some little inconsistency in the defense....," was sufficient to place the trial judge in *Glasser*, 315 U.S. at 68, on notice of a potential conflict of interest, finding that the Farese motion did not trigger a duty to make inquiry under *Holloway* is contrary to or an unreasonable application of *Holloway*.

Additionally, the undersigned finds the motion filed by Waide under the circumstances of this case, independent of the Farese motion, was a timely objection. The Mississippi Court of Appeals again made no finding on the timeliness of Waide's motion on the morning of trial having applied the wrong precedent. Waide was hired and entered his appearance on the eve of trial, but under extraordinary circumstances. He replaced an attorney deemed by the Mississippi Court of Appeals to have been unprepared for trial in the final few days before trial. Waide recognized the conflict immediately and entered his objection on behalf of the Saltses at the earliest possible time. An objection during trial has been held under some circumstances to be timely for the purposes of *Holloway. Harris v. Carter*, 337 F.3d 758, 764 (6th Cir. 2003). Under the unique circumstances of this case, the motion was timely. Of course, the record bears out that Waide's motion is in fact a reiteration of Farese's motion more than two years earlier and, therefore, rightly must be considered together with the earlier motion.

Because two timely objections/motions to the joint representation were made, the trial court was obliged to make inquiry regarding the conflict of interest. The court should have addressed the

defendants individually to ascertain that they understood the conflict problem. The court should have obtained a knowing and intelligent waiver of the right to counsel; taken action to obviate the problem, such as requiring separate counsel; or made a determination that there was no conflict of interest. *Holloway* does not require a showing of an actual conflict, though as discussed hereafter, the record establishes an actual conflict of interest. Because this case is controlled by *Holloway,* not *Sullivan*, the convictions must be set aside whether or not the court is satisfied that an actual conflict of interest was demonstrated by the record. Having had the problem of the potential conflict of interest raised with it on two occasions, the trial court committed constitutional error in refusing to hold a hearing to investigate the conflict of interest. The Mississippi Court of Appeals applied the wrong law and reached a conclusion contrary to federal law as enunciated by the United States Supreme Court.. The Saltses were entitled to an automatic reversal. The Court held that under *Glasser* "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Holloway*, 435 U.S. at 1181. There is no need to show any particular prejudice. The reversal is automatic even "'if the defendant was clearly guilty.'" *Id*., quoting *Chapman v. California*, 386 U.S. 18 (1967)(Stewart, J. concurring). The court should conditionally grant the writ of habeas corpus and vacate the sentences, subject to the right of the state to pursue a new prosecution and trial within a reasonable time not to exceed 120 days.

<u>ANALYSIS UNDER *SULLIVAN*</u>

The Mississippi Court of Appeals found that their was no actual conflict of interest shown in this case.

> Nothing conclusively indicates that Michael or Marie had interest that were at first to each other, or that Waide should have engaged in some course of conduct that would have been adverse to the interest of one or the other. The Salts merely suggest that some of the evidence indicated the possibility of a conflict between Michael and Marie. We note that Marie took the stand and testified, essentially that neither she nor Michael had ever embezzled the insurance money. The Saltses have the best shown a potential conflict, which does not require that the court make any inquiry into the chart representation." *Salts* , 984 So.2d at 1063.

As stated above, it is clear that *Holloway,* not *Sullivan*, is controlling, but the undersigned alternatively recommends that the proper application of *Sullivan* leads to the same result as under *Holloway.* After a review of the record, the undersigned finds that the holding of the Mississippi Court of Appeals that an actual conflict of interest was not shown on the record is based upon an unreasonable finding of facts and/or unreasonable application of federal law to the facts. Even under the *Sullivan* case, the petitioners have shown an actual conflict of interest that adversely impacted their representation.

First, it must be noted that two different attorneys, both well known and recognized for their extensive criminal defense experience, have told the courts that there is an actual conflict of interest between the Saltses. The fact that they have both said the same thing is not binding on the courts but definitely pertinent to this and every other's court's consideration. "An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the court." *Holloway*, 435 U.S. at 486, quoting from *State v. Davis*, 110 Ariz. 29, 514 P.2d 1025,1027(1973). As officers of the court their

declarations to the court are effectively made under oath. If one attorney telling the court of the existence of a conflict of interest is presumed to be accurate, two experienced attorneys telling the court the same thing should not be lightly disregarded. Both the trial and appellate state courts have brushed this aside.

One question to be answered is what constitutes a conflict of interest. What is an actual as opposed to a potential conflict of interest. The Mississippi Court of Appeals relied upon definitions found in this court's opinion in *Irving v. Hargett*, 518 F. Supp. 1127 (N.D. Miss. 1981). This decision references several definitions. There is "an actual conflict of interest, as distinguished from a hypothetical or speculative conflict, ... "when the defense attorney places himself in a situation inherently conducive to divided loyalties." *Id.* at 1143, quoting from *U.S. v. Kranzthor*, 614 F.2d 981, 983 (5th Cir. 1980) and citing *United States v. Medel*, 592 F.2d 1305, 1310 (5th Cir. 1979) (actual conflict is "divergence of the party's interest.") The court in *Irving* also stated,

> [I]f a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client." *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir.) cert. denied for 44 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979)

*Id.* at 1144.

*Irving* also quoted from *Foxworth  v. Wainwright*, 516 F.2d 1072, 1076, 1080 (5th Cir. 1972), which held that "[a] conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing  probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing" and that "[a]n alleged conflict of interest that obstructs the use of a particular such strategy or defense is not significant unless the defense is plausible." *Irving,* 518 F. Supp. at 1144. This court in *Irving* ultimately opted

40

to apply the Ninth Circuit's test. "Did the representation deprive ... defendant () of the undivided loyalty of counsel? Did counsel have to, or did he in fact, 'slight the defense of one defendant for that of another?'" *Id.* (Citations omitted).

Was there an actual conflict of interest in this case, which impacted the defense of these two defendants? "[I]n a in case a joint representation of conflicting interests of the evil-it bears repeating-is and what the advocate finds himself compelled to *refrain* from doing...." *Holloway*, 435 U.S. at 490-91. In looking at what counsel was compelled to refrain from doing, after being compelled to continue his joint representation, the record reveals the actual, not potential conflict and the adverse impact on the representation that could be provided to each of the Saltses.

The respondents assert that there is no actual conflict of interest in this case. Like the Mississippi court they cite to Marie's testimony and that she did not try to implicate her husband. When the trial judge forced the Saltses to trial with one lawyer, their counsel had no option but to attempt to present a united front. That a united defense was presented at trial does not negate the existence of and impact of the conflict of interest. "[T]hat the defenses of the petitioners were not mutually inconsistent" ... "is not an infrequent consequence of improper joint representation." *Holloway*, 435 U.S. at 496. (Powell, J., dissenting). The respondents confuse the lack of conflicting evidence, the lack of finger-pointing, coming from the defendants with a lack of a conflict.

The following are just two examples of what counsel was not able to do in this case because of the conflict between his clients. Marie admitted on the stand that she was in charge of all of the bookkeeping. She said that Michael could not even balance his checkbook. This is critical evidence that is potentially exculpatory to him. But Michael's attorney could not highlight this helpful evidence for his client in closing, nor develop it in cross-examination of Marie, because it was damning to his other client. Michael's attorney was silenced by the conflict.

41

The bulk of the state's case in chief concentrated on Michael's role as the leader of the business and his contact with the customers. Michael not only spoke with customers but was the primary person who received monies from the clients. His prominence in receiving monies would be a plausible argument on Marie's behalf that monies were not received by her, and/or that she relied on Michael on where to credit the monies. During the testimony relating to Count I, a check was introduced into evidence. It was for $ 76.56. The back of the check showed that it was endorsed by Salts Funeral Home and Michael Salts. It was cashed at a local gas station. With an alleged total embezzlement of $ 272.14 (R.8:530) on this count and the state conceding that any amount under $ 250.00 should be treated as a misdemeanor, this evidence should have been argued in Marie's favor. But her attorney could not make this plausible argument on her behalf because of this conflicting loyalty to Michael.

This case does not involve potential, but actual conflicts of interest. Any attempt to gloss over the conflict can only be understood as an attempt to affirm the cast based upon a record indicative of guilt and an implicit finding of harmless error. This is contrary to the holding of *Sullivan*. Paraphrasing *Sullivan*,

> *Glasser* established that unconstitutional multiple representation is never harmless error. Once [this court] finds that [the Saltses lawyer] had an actual conflict of interest it must refuse...to 'indulge in nice calculations as to the amount of prejudice 'attributable to the conflict. The conflict itself demonstrated a denial of the right of effective assistance of counsel." 315 U.S. at 76, 62 S.Ct. at 467. Thus ...defendant[s] who show... that a conflict of interest actually affected the adequacy of ...[their] representation need not demonstrate prejudice.

*Sullivan*, 446 U.S. at 350, 100 S.Ct. at 1719; quoting *Glasser*, 315 U.S. at 72-75, 62 S.Ct. at 465-67.

Even under *Sullivan* the petitioners are entitled to relief.

42

<u>CONCLUSION</u>

The undersigned recommends that the petition for habeas corpus be granted conditionally. The decision of the Mississippi Court of Appeals is contrary to *Holloway v. Arkansas*, 435 U.S. 1173 (1977). The convictions of Marie Salts and Michael Salts should be vacated and the state provided a time certain of 120 days in which to commence a new prosecution/trial of the petitioners.

The parties are referred to 28 U.S.C. 636(b)(1) and Local Rule 72.1(C) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections are required to be in writing and must be filed within ten days of this date. Failure to file written objections to the proposed finding and recommendations contained in this report within ten days from the date of filing will bar an aggrieved party from challenging on appeal both the proposed factual findings and the proposed legal conclusions accepted by the district court *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

This the 18th day of June, 2009.

/s/ JERRY A. DAVIS
UNITED STATES MAGISTRATE JUDGE

43